Please decode. My name is Henry Langer. I'm from Salem, Oregon. This is a criminal defendant's appeal from the trial court. Order in denying her pre-trial motions, namely the motion to suppress. The defendant was arrested without a warrant in front of her apartment. And her apartment was searched also without a warrant. Only subsequently a warrant was issued. Defendant's position is that the police didn't have a probable cause and there were no exigent circumstances that would be justifying the arrest and the search. The main issue here is whether the police officer's assertion that they detected odor of methamphetamine was reasonable. This is an unusual case because defendant presented expert evidence and there was a biochemist's opinion as to whether there could be any smell or odor of methamphetamine emanating from the apartment. As a matter of scientific probability, the defense expert chemist concluded that no process of methamphetamine cooking took place in the apartment and that no chemicals that were seized could emanate any odor. The government's expert, Mr. Eli, agreed that he could not tell with a scientific probability that the methamphetamine has ever been cooked in that apartment or that anything ever was titrated or that pills were put. There was testimony, wasn't there, that the deputies know what it smells like to cook methamphetamine? There was this testimony. And they testified that they smelled that smell. And he also testified that he's not an expert on smell. And the judge believed it. I don't think that that's what the judge said.  Well, in a narrow way, maybe he did. But he said that the factual finding was that there was a pill of pseudoephedrine, which was a dry paste, and that is what caused the smell. Very narrow ruling on the facts. And none of these experts, not even the police officers, said that dry pseudoephedrine can smell. Suppose they're wrong, that it, to them, smelled like methamphetamine being cooked there. Suppose they smelled a smell that they recognized, or what they thought was the smell of methamphetamine being cooked. Well, they couldn't. They couldn't because there was no such source of such a smell. I said they're wrong. But they, in good faith, thought it smelled like methamphetamine being cooked. Number one, they could have lied. Okay, but suppose it's true. There's more to it. There is evidence that in the vicinity, there was a lot of smell of methane. Defense experts who went there sometime after this happened also smelled that. And in this opinion, the defense expert says that all liquids in the department were cupped. Nobody ever contested that they were cupped. We're not really focusing in on what I'm trying to get at. What I'm trying to get at is if these officers thought in good faith they smelled methamphetamine being cooked, if that's what they thought, even if it's wrong, even if it's from the sewer, even if it's from the cat, whatever it is, they think they smell methamphetamine being cooked. Yes. What are they supposed to do? Why can't they go in there and make sure there isn't a pot of methamphetamine being cooked on the stove? It's not enough for entry. There are these two cases from the Supreme Court which say that the sense of smell is not enough for search or arrest. And they don't have anything else, I believe. There was no other information which would add it to the fact that if you presume that they smelled something, they could go in. They should have gone to a magistrate, impartial magistrate, and requested a search warrant. He would be detached. He's not the one who is chasing in a heap of passion criminals. He's the one who should have made the decision. Why can't they just go do a quick check to make sure there's nothing on the stove so it doesn't explode? There were no exigent circumstances, rather, because there was no fire, there was no smoke. There were no exigent circumstances. They were denied the entry and they went in anyway, apparently because they just were curious to see. There's a fire station about 150 feet from the place. And these officers, under the rules of Montenegro here, were supposed to wear a hazmat. They were supposed to create a protective perimeter. They were supposed to put those who they arrested into protective clothing. They were supposed to do many things they didn't. So I don't think there were any circumstances which would justify their entry. There were no exigent circumstances. And the judge didn't know that there were. And if this is allowed, it seems to me that a police officer can pretty much arrest anybody who he believes that he may be a so-called junkie on the street. He's going to go and smell him and say, I smell something on you and that reminds me that that may be marijuana, that may be methamphetamine. And he goes into his pocket. I don't think that's what they can do under the Fourth Amendment. They just cannot go and search people based on the smell. They could run through the city and do it to just about anybody. And that's why I think that these two Supreme Court cases apply. And the government is citing Lillard and Ojeda, and Judge Hagerty allegedly ruled based on Ojeda. Ojeda was a completely different case. The police officers who came on premises in Ojeda, they had a search warrant. They had a probable cause. They knew methamphetamine was being cooked there. And five feet from that structure, there was a garage in which somebody was cooking methamphetamine. And when they came in, they saw that somebody slammed the door inside. So there was somebody inside and the court in that case in Ojeda said, well, they were on the premises lawfully because they had a search warrant. There has to be something in addition to the sense of smell. And I believe that they didn't have it here in this case. And I don't believe that even a smell which a dog can perceive, and it's a trained dog, is enough by itself, on itself, for a probable cause to arrest somebody or search the premises. And as the expert said, the sense of smell is very individual. The government expert admitted that. There are no national standards for smelling, sniffing. There are no national standards for training police officers how to distinguish innocent activity like painting, stripping, using toilet for absolutely innocent reasons from cooking methamphetamine. And the government expert at the end admitted that there was no lab. There was no active lab. In addition, he said, he couldn't say with scientific probability, that anybody ever cooked, pulled, or titrated methamphetamine on the premises. It was a wrong search, and it is not a right decision. I would like to reserve a few minutes on a series of questions for others. Thank you very much. This is the court. I'm Leslie Baker on behalf of the government. And in this case, we do acknowledge that the crux issue here before the district court was whether or not there was the smell of methamphetamine. The trial court conducted a hearing. The court heard from five different witnesses, and the only one witness at the hearing below for which there is no evidence that that person even knew what the smell of methamphetamine was, was the expert brought before the defendants. Both of the police officers involved had extensive training in methamphetamine laboratories as well as experience. We presented the testimony of a senior DEA chemist who had 21 years as a chemist, who also had extensive experience both in the processing of labs and in conducting training for law enforcement. And he talked about how the smell recognition is a critical part of the training because the smell is so strong and it is so distinctive. And that that's a really essential component. He further talked about the dangers associated with methamphetamine laboratories that in his expert opinion made it imperative for the officers to go in that apartment, to conduct a protective sweep to make sure that there was nothing that would cause a greater danger. Officer Kubik, who was the case agent in this, enunciated the three items that are of most concern for the accident circumstances component of the protective sweep. That being, first of all, the presence of other people in there who could change the situation and make it worse or destroy evidence. And we have that in this case. They didn't know whether Gordon Milligan was in the apartment or not. He had been there three months earlier. You mean it's allowed to say someone visited the apartment three months ago to say, well, maybe he's there three months later? Well, it was the apartment of his girlfriend at the time. So I think that's why they went looking for him there, because they knew them to be together frequently. There was no. Currently or knew that sometime in the past? In terms of the relationship, they knew that in the past. The defendant denied at the time that they should contact her. They contacted her on this occasion that that was still the situation, that they still had the relationship. So it would be hard to think of a situation in which you wouldn't then be able to say, well, we thought someone else might be in the apartment. Most people have other people have been in the apartment. Well, in this particular case, because the officer described the previous arrest incident where he said that there was considerable discussion between himself and the defendant about whether Mr. Milligan was there that previous time and whether he would come out, indicating that she tried to cover for him on the initial arrest. So that was only point one was that somebody else might be there. Exactly. That's two and three. Two and three are the potential with a methamphetamine laboratory for fire and explosion. Mr. Langer talks about the fact that there was no smoke coming out. But Mr. Ely, the DEA expert, indicated that a methamphetamine lab doesn't just all of a sudden explode, that there are steps that will happen before it gets to that extreme of a danger where there is a fire or explosion. But the third aspect is the chemicals that are used in the reaction and that if they are mixed improperly or inappropriately can create extremely toxic kinds of fumes. There was some discussion below with both the investigating officers as well as the DEA expert about the possibility of white phosphorus being created if something is done wrong with the chemicals, which would create an extremely bad situation in terms of toxic fumes. Where would a protective sweep disclose with respect to that? They could see if there were chemicals there that needed to be handled in some way, if they needed to get other kinds of expertise in there, just exactly what the situation is, because I'm not a chemist at all, but my understanding is that if there is heat involved with some of the chemical reactions, that that makes it a more dangerous situation. And so depending on what's going on inside, they can determine. But aren't they supposed to do that anyway? I'm sorry? When you think there's a lab there, aren't they supposed to call and have all that done? Well, in this particular case, and the defendant has made a big deal about calling Hazmat, but both these officers were Hazmat certified. So they had the qualifications of going in there, and if they had seen the stove on or some other thing going on, they potentially had the training to deal with it. If they didn't, then, as they talked about, they could back out and call someone who did have the training. But they had had extensive training and could very possibly have dealt with any emergencies that they found inside. It's our view that basically this boils down to a credibility determination, however, that the trial court made. Two experienced officers and, in fact, the co-defendant, who detailed the different parts of the reaction that he had done in the apartment, showing clearly he had done things there that would leave a smell as a response to the allegation that it was live. The second allegation that the defendant made was that they may have mistaken the smell of methamphetamine for something else that was there. And, again, Mr. Ealy, the DEA expert, answered in cross-examination, I believe it's at page 190, directly to Mr. Langer, that you absolutely not mistake sewer odors and methamphetamine smell, that it's very distinctive and that's an important part of the training. Was there a smell to the use of methamphetamine, the smoked methamphetamine? I don't believe that there was any evidence in the record to that. And I think there may be, but there was no evidence one way or another on the smoking. There was evidence that it had been used and that some had been dried and that each stage of methamphetamine production has different odors associated with it. Based upon the evidence presented, we believe that the trial court was absolutely right in finding the officers credible and completely right in determining that the defendant was smoking. Do you agree with your present counsel that simply smelling methamphetamine is not enough and that the Supreme Court said that, that you need something in addition to that? Well, the Supreme Court said, and I quoted in my brief that the defendant didn't complete that quote, that the odor, if it's sufficiently distinctive and smelled by someone who has experience in that, may be enough. That was in the context of a magistrate making a determination here. In other words, no, you do not agree. No, I don't. But in this case, we have more than the odor. We have the officer's knowledge of the background of these, that Ms. Eaton was a user of methamphetamine, that she was the girlfriend of what they called serious methamphetamine cooks, and those were cooks that produced pound or multi-pound quantities. They had information that Mr. Luton was a cook, and those factors taken together with the smell was, clearly they had probable cause to affect the arrest. And given the crime that they were investigating, there were exigent circumstances to support the protective sweep. Overall, I would suggest to the Court that the officers did exactly what we would want them to do. They went to the residence. They followed the information as it developed. They took limited action in the protective sweep of two to three minutes to make sure that there was no dangerous situation, and then they went back to the office and prepared a search warrant, which they then presented to a judge, laying out all the details of the arrest in the protective sweep, before they went back to actually search the apartment. And I would suggest that, based upon that, we would ask that you affirm the district court. Thank you. Thank you. This Mr. Luton, who was allegedly suspected of being a cook, he was in contact with police two years before this occurred, and when we had a hearing, I reminded Judge Haggerty that I asked him for reconsideration. Judge, it is a very stale information. Judge, you cannot say that somebody is a cook, and he was suspected to be a cook two years ago, and the judge said, oh, I saw those were two months. So he committed this error, regarding other issues. But after hearing that from you, he did not change his decision? No, he did not. And we knew then, and the government confirmed, and it's in our briefs, that it was about a year and a half to two years ago. And these officers were at the place for 12 minutes, maybe 15 minutes, based on the testimony of witnesses, and they begged Ms. Peterson to let them in. And after she refused, they asked her again and again, and she refused to let them in. They put her in the cuffs. They set her in front of the door, which now the government says created some kind of danger inside. They didn't protect the ISPs. They may have had some training, but like Officer Anderson, admitting that he doesn't know the rules in Multnomah County, how to proceed, how to create protective perimeter. The expert for the government agreed that he never read these rules. So his testimony was inherently inconsistent. When he says, yes, somebody may have, could have, but I cannot say with sound effect probability that anybody ever could, titrated or could. There was no movement inside, like in Ojeda. They didn't hear these officers inside. Nobody was slamming the door. There was no smoke, nothing. They just could have stepped away, called the hazmat if it was an emergency, or asked for a warrant. And they didn't need to ask for 12 or 15 minutes for permission to enter. And you're saying they could have had hazmat come by and walk through the house? If they felt there was an emergency, they could have broke down the door right away and not ask for the permission for 12 minutes. There were people standing in the apartment hall. It's like an apartment house. They were standing next door. If there was an explosion, they would have been killed. These officers were not in because there were any exigent circumstances. They went in because they were curious. That's all I have. Thank you very much. Thank you very much. Thank you very much. Thank you, sir. You have been submitted.
judges: Reinhardt, Silverman, Clifton